## VERSAILLES HOTEL v. SOUTHERN BELL TEL. CO., et al.

Circuit Court, Dade County.
November 21, 1951.

Genet & Genet, Miami Beach, for plaintiff.

John H. Wahl, Jr., Miami, for defendant.

Lewis W. Petteway, Tallahassee, for the Railroad & Public Utilities Commission.

Mallory H. Horton and Milton M. Ferrell, both of Miami, for Sheriff Thomas J. Kelly.

Hunt, Salley & Roman, Miami, for Sheriff Jimmy Sullivan and Sheriff Jack B. Henderson.

GEORGE E. HOLT, Circuit Judge.

On March 15, 1951 (dates hereinafter mentioned are all in 1951), Malco, Inc., a corporation doing business as the Versailles Hotel, filed a sworn bill of complaint praying for an injunction restraining the defendant telephone company from discontinuing service. The bill alleged that on March 9 the sheriff wrote the telephone company directing it to discontinue service at the hotel because a line was being used for gambling, and that thereafter the company advised the hotel all service would be discontinued at 5 P. M. on March 15. The bill further alleged that the hotel facilities were not intended for use and had not been used in violation of any law, that the sheriff's letter was sent to the company pursuant to rule 1592 of the

Railroad & Public Utilities Commission (hereafter referred to as the commission), that the rule was being applied to the hotel in an unconstitutional, arbitrary and unreasonable manner, and that an attempt was being made to deprive the hotel of its property without due process of law.

On the same day, March 15, based on proofs offered by the hotel including affidavits by its president and manager, the Honorable J. N. MORRIS, one of the judges of this court, entered a preliminary order restraining the telephone company from discontinuing service.

On May 2 the court joined the sheriff and the members of the commission as defendants, all of whom filed answers. On October 22 the court heard testimony at a final hearing, when all parties except the commission members were present and represented by counsel.

The sheriff's letter to the company directing it to discontinue service on no. 5-6092 at the hotel stated, inter alia: "On March 8, 1951 deputy sheriffs J. L. Webb and T. I. Adkins arrested Jack Kaplow and Arthur Goldberger in the Versailles Hotel, 3425 Collins Ave., Miami Beach. Kaplow and Goldberger were taking horse bets from guests in the cabanas in this hotel and telephoning bets over no. 5-6092." Upon receipt of the letter the company wrote the plaintiff that all service at the hotel would be discontinued. Pretended authority for the letter flows from commission rule 1592. The pertinent part of the rule follows:

"Whenever any such utility is notified in writing by any state or federal law enforcement officer acting within his apparent jurisdiction, either directly or through this commission, that certain telephone or telegraph facilities, or any part thereof, are being used or have been used in violation of any law or the laws of the state of Florida, then such utility shall disconnect and remove such facilities and discontinue all telephone and telegraph service rendered over said facilities."

Emmett W. Kehoe, an assistant county solicitor, testified for the hotel. He stated that deputy sheriffs Webb and Adkins came to his office and advised that they had arrested Kaplow and Goldberger at the hotel on March 8, booking Kaplow for operating a gambling house and Goldberger for gambling. The deputies informed him they had seen Kaplow and Gold-

berger talking to people and had seen one of the two make a telephone call. They had seen the two throw some papers on the ground but when they picked up the papers—"they were unable to say what they were. They had no dollars and cents marks on them. No words. Nothing of any kind except figures. None of the figures corresponded to any numbers of horses on the Harvey A. Jr. scratch sheet."

When Kehoe asked how close they were to the people when they saw Kaplow and Goldberger have conversations with them, they said they were not closer than thirty feet, and they heard none of the conversations. Kehoe took affidavits from them, considered their testimony and advised—"I thought we had nothing on the men, and I announced 'no information.'" He was asked—"You announced 'no information' because you believed there was not sufficient evidence on which to base a charge that these men were, in the case of Kaplow operating a gambling house, in the case of Goldberger gambling, is that correct?" To which he replied—"That is right."

The only witnesses who could substantiate the charge made in the sheriff's letter were deputies Webb and Adkins. They never appeared or testified, nor were either of them subpoenaed by any of the defendants to testify herein.

Aaron Smith, the hotel manager who lives on the premises, testified that the facilities were used in compliance with all federal and state laws, that the hotel did not rent or lease any part of the premises for bookmaking or any unlawful purpose, that the hotel did not know of any telephone in the hotel being used for gambling, nor had he ever seen any one soliciting horse bets in the hotel, even though he walked around the premises all the time. He did not know of any persons named Jack Kaplow or Arthur Goldberger. There are 160 telephones in the hotel, 144 in rooms, the remainder in other parts of the hotel and premises.

Leonard Adelman, president of the hotel corporation, who supervises its operation and its executives and employees, testified that the facilities were not used for any illegal or unlawful purpose and that there was no gambling on the premises.

It was on this type of testimony that the sheriff instructed the company to discontinue all service at the height of the season to a large oceanfront tourist hotel.

The bill alleged that the hotel was then occupied by 225 guests and that it would suffer great and irreparable injury should its facilities be discontinued. It is obvious that the guests would not long remain at the hotel were they deprived of telephone service, and the vacating of the hotel premises at the height of the season would cause the plaintiff to suffer a financial loss beyond calculation.

The bill does not attack the validity of the commission rule but does allege that the rule was being applied in a unconstitutional, arbitrary and unreasonable manner. The evidence amply sustains this allegation. A court of equity should not and will not allow a person to be so harmed and injured. Equity requires that at least a prima facie case be made before telephone service can be thus summarily discontinued.

The commission rule has been before our Supreme Court in Dade County Newsdealers Supply Co. v. Florida R. R. & Public Utilities Comm., 48 So. 2d 89. "The question" in that case, the court said, "turns on the illegality of the service, not whether any equitable right is being invaded." The court held that under the facts in that case the rule was properly applied, but said:

> "In this we do not mean to hold that conditions might not arise in which one whose service is ordered to be discontinued might not be entitled to a hearing before the order is effectuated. This would of course be on a showing that some equitable right was violated, but no such case as that is made here. The question here turns on the illegality of the service, not whether any equitable right is being invaded. If equities are shown to be involved a court of equity would have jurisdiction . . .
>
> ". . . if the appellant had assaulted the rule of the commission on the ground that it was arbitrary and unreasonable, or that it was unconstitutional, or that it was being applied in an unconstitutional manner . . . but no such challenge is proffered in this case . . ."

The bill alleged that equitable rights were about to be invaded by an application of the rule, that without the intervention of a court of equity plaintiff would suffer great loss. The court enjoined the enforcement of the rule, the court has now inquired into all the facts and it has been affirmatively established that none of the facilities were being used in violation of

any law. Clearly, the sheriff was not justified in directing the company to discontinue service. It is significant that none of the defendants, the company, the sheriff or the commission, offered any testimony, in fact those present at the hearing announced to the court that they had no testimony to offer.

The court is in receipt of a letter dated September 11 from Guyte P. McCord, Jr., assistant counsel for the commission, stating, inter alia:

"In several instances recently where law enforcement officers have ordered removal of telephone facilities under chapter 26820, Laws of Florida, Acts of 1951, the telephone subscriber has attempted to obtain from the circuit court of Dade County a temporary restraining order pending a hearing before this commission under the statute. As we understand this statute (which was formerly a rule of this commission) and the construction placed upon it by the Supreme Court in the Newsdealers Supply case, this commission's jurisdiction begins after the telephone facilities have been removed. Its jurisdiction then is to determine whether or not the service should be restored and under what conditions restoration may be granted. As the Newsdealers Supply case pointed out, however, the jurisdiction of a court of equity may be involved where equities are involved. Since it appears that this commission's jurisdiction only relates to restoration after removal, it would follow, we believe, that if the removal is enjoined by the court the jurisdiction would remain in the court until final disposition by it."

The court finds as a matter of fact and as a matter of law that the equities of this cause are with the plaintiff, and that the plaintiff was and is entitled to the relief prayed for in the bill of complaint. It is ordered, adjudged and decreed that the preliminary restraining order entered on March 15 be and the same is hereby made permanent. It is further ordered, adjudged and decreed that the defendant Southern Bell Tel. & Tel. Co. and the sheriff of Dade County are permanently enjoined from removing any of the telephone facilities or disconnecting telephone service for the Versailles Hotel on account of any of the matters related in the pleadings and involved in this cause.